178 Cal.App.4th 778 (2009)
THE PEOPLE, Plaintiff and Respondent,
v.
JAMES ROY GLENN, Defendant and Appellant.
In re JAMES ROY GLENN on Habeas Corpus.
Nos. G040608, G041245.
Court of Appeals of California, Fourth District, Division Three.
October 26, 2009.
*786 James Roy Glenn, in pro. per.; and Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant and Petitioner.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Bradley Weinreb, Teresa Torreblanca and Elizabeth Voorhies, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
FYBEL, J.โ

INTRODUCTION
James Roy Glenn was adjudged a sexually violent predator (SVP) under the Sexually Violent Predator Act, Welfare and Institutions Code section 6600 et seq. (SVPA),[1] and was placed in involuntary commitment for an indeterminate term. Glenn was 82 years old at the time of trial. He appealed, and later filed a petition for writ of habeas corpus also challenging the commitment order. We issued an order to show cause and consolidated the writ petition with the appeal. We affirm the judgment and deny the writ petition.
Glenn was committed as an SVP following initial evaluations under section 6601, subdivision (a) conducted in accordance with a standardized assessment protocol developed by the State Department of Mental Health (DMH). In 2008, the Office of Administrative Law (OAL) determined the 2007 standardized assessment protocol constituted an invalid "underground" regulation.
First, we conclude the trial court did not err by precluding one of Glenn's expert psychologists from testifying about studies and research conducted by nontestifying mental health experts concerning whether pedophilia is chronic.
Second, even assuming for sake of argument the OAL was correct in its determination the assessment protocol is invalid, we hold any error in using evaluations based on that protocol did not deprive the trial court of fundamental jurisdiction over the SVPA commitment petition. Accordingly, we apply a harmless error analysis to use of the invalid assessment protocol and conclude Glenn received a fair trial and suffered no prejudice. His challenge *787 to the assessment protocol, and his claim his trial counsel was ineffective for not challenging the assessment protocol, therefore fail.
Third, we hold the amendments to the SVPA added in 2006 by the Legislature and by passage of Proposition 83 do not violate the due process, equal protection, ex post facto, and double jeopardy clauses of the United States Constitution and the California Constitution.

OVERVIEW OF THE SVPA
The SVPA provides for involuntary civil commitment of an offender immediately upon release from prison if the offender is found to be an SVP. (People v. Yartz (2005) 37 Cal.4th 529, 534 [36 Cal.Rptr.3d 328, 123 P.3d 604].) The SVPA "was enacted to identify incarcerated individuals who suffer from mental disorders that predispose them to commit violent criminal sexual acts, and to confine and treat such individuals until it is determined they no longer present a threat to society." (People v. Allen (2008) 44 Cal.4th 843, 857 [80 Cal.Rptr.3d 183, 187 P.3d 1018]; see Hubbart v. Superior Court (1999) 19 Cal.4th 1138, 1171 [81 Cal.Rptr.2d 492, 969 P.2d 584] [SVPA proceedings are designed "to provide `treatment' to mentally disordered individuals who cannot control sexually violent criminal behavior"].) "`[A]n SVPA commitment proceeding is a special proceeding of a civil nature, because it is neither an action at law nor a suit in equity, but instead is a civil commitment proceeding commenced by petition independently of a pending action.'" (People v. Yartz, supra, 37 Cal.4th at p. 536.)
An SVP is defined as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (ง 6600, subd. (a)(1).) A "diagnosed mental disorder" is defined to include "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (ง 6600, subd. (c).)
The procedure for determining whether a convicted sex offender is an SVP typically begins when an inmate is scheduled to be released from custody. (Turner v. Superior Court (2003) 105 Cal.App.4th 1046, 1054 [130 Cal.Rptr.2d 300].) "`Under section 6601, whenever the Director of Corrections determines that a defendant serving a prison term may be a sexually violent predator, the Department of Corrections and the Board of Prison Terms undertake an initial screening "based on whether the person has committed a sexually violent predatory offense and on a review of the *788 person's social, criminal, and institutional history." (ง 6601, subd. (b).)'" (People v. Hurtado (2002) 28 Cal.4th 1179, 1182-1183 [124 Cal.Rptr.2d 186, 52 P.3d 116].)
The screening is conducted in accord with an assessment protocol developed by the DMH. (People v. Hurtado, supra, 28 Cal.4th at p. 1183.) "`If that screening leads to a determination that the defendant is likely to be a sexually violent predator, the defendant is referred to the Department of Mental Health for an evaluation by two psychiatrists or psychologists. (ง 6601, subds. (b) & (c).) If both find that the defendant "has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody" (ง 6601, subd. (d)), the department forwards a petition for commitment to the county of the defendant's last conviction (ibid.). If the county's designated counsel concurs with the recommendation, he or she files a petition for commitment in the superior court. (ง 6601, subd. (i).)'" (People v. Hurtado, supra, 28 Cal.4th at p. 1183.)
The trial court holds a hearing on the petition to determine whether "there is probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release." (ง 6602, subd. (a).) The probable cause hearing is an adversarial hearing where the person named in the petition has the right to counsel. (Ibid.) If the court finds probable cause, it orders a trial to determine whether the person is an SVP under section 6600. (ง 6602, subd. (a).) The person named in the petition must remain in a secure facility between the time probable cause is found and the time trial is completed. (Ibid.)
The person named in the petition is entitled to a trial by jury, and the jury's verdict must be unanimous. (ง 6603, subds. (a), (f).) The person named in the petition also is entitled to retain experts or professional persons to perform an examination on his or her behalf. (ง 6603, subd. (a).) At trial, the trier of fact determines whether, beyond a reasonable doubt, the person named in the petition is an SVP. (ง 6604.)
The SVPA grants the person named in the petition the right to be present at the commitment proceeding and "the benefit of all constitutional protections that were afforded to him or her at the initial commitment proceeding." (ง 6605, subd. (d).) If the trier of fact determines the person named in the petition is an SVP, the person is committed for an indefinite term to the custody of the DMH for appropriate treatment and confinement in a secure facility. (ง 6604.)

*789 FACTS

I.

The People's Case
In 2005, the Office of the District Attorney of San Bernardino County filed a petition for Glenn's commitment as an SVP pursuant to section 6600 et seq. At the jury trial, conducted in January and February 2008, the deputy district attorney called Jeffery Hart and licensed psychologists Mark A. Schwartz and Dawn Starr as witnesses. Hart had been Glenn's former neighbor in North Carolina, and Schwartz and Starr had evaluated Glenn and testified he qualified as an SVP. The deputy district attorney also called Glenn to testify as an adverse witness.

A. Jeffery Hart

In 2000, Glenn purchased two acres in rural North Carolina and lived there in a mobilehome. Jeffery Hart was Glenn's neighbor. Hart and Glenn initially got along well, but they had a falling out because Glenn wandered around his property in the nude. Glenn cut down the trees on his property, and would situate himself in his yard or on his roof to make himself visible. On several occasions, Hart's mother, who lived with Hart, saw Glenn naked. Hart asked Glenn not to appear naked in front of her. According to Hart, Glenn "just got bolder and bolder every day."
One morning, Hart informed Glenn that four women were coming to look at nearby property and asked that he wear clothing when they arrived. When the women drove up the road, Glenn, wearing only fishnet underwear, blocked the road with his backhoe. Glenn got down from the backhoe and walked over to talk with the women.
Glenn twice told Hart that Glenn needed "a young boy" to help with work around the house. Hart did not recommend anyone to Glenn and testified, "by the way he was acting, I wouldn't subject any kid to that."

B. Mark A. Schwartz

Mark A. Schwartz held a Ph.D., had been a licensed psychologist for 27 years, and worked under contract for the DMH. He interviewed Glenn in 2005 and 2006 and prepared reports in January and November 2007. Schwartz considered three criteria: (1) whether Glenn committed qualifying *790 predicate offenses; (2) whether he has a mental disorder predisposing him to commit future sexual offenses; and (3) whether he is at risk of committing future sexual offenses.
Under the first criterion, Schwartz concluded Glenn had committed four predicate offenses against three victims, all of whom were under 14 years of age. In 1988, Glenn invited a nine-year-old boy and an 11-year-old boy to his house, where he gave them treats, showed them sexually explicit movies, exposed himself, and touched them. As a result, a jury convicted him of two counts of committing lewd and lascivious acts with a child under the age of 14. Also in 1988, Glenn molested a seven-year-old girl by exposing himself and masturbating in front of her, for which another jury convicted Glenn of two counts of the same crime.
Schwartz also explained that Glenn had been convicted of offenses that did not qualify as predicate offenses for an SVP determination. Glenn had been convicted of an attempt to commit lewd and lascivious acts with a child under the age of 14 for exposing himself to and masturbating in front of a boy. Glenn also had been convicted on two indecent exposure charges involving two girls. Schwartz testified he "really didn't have to" consider those incidents, but they "just hardened the fact that [Glenn] was a pedophile."
Under the second criterion, Schwartz concluded Glenn suffers from pedophilia, nonexclusive, with sexual attraction to both male and female children.[2] Schwartz based his conclusion of pedophilia on Glenn's qualifying and nonqualifying offenses, and incidents appearing in police reports that did not lead to charges. Schwartz concluded Glenn was volitionally impaired from pedophilia because he continued to engage in pedophilic behavior even after being arrested and imprisoned for sex crimes.
Under the third criterion, Schwartz concluded there was a serious and well-founded risk that Glenn would commit sexually violent criminal acts in the future. Schwartz considered Glenn's score on the Static-99, an actuarial tool used to predict recidivism in sex offenders. Although Glenn's score of seven on the Static-99 usually would place him in the high risk category, Schwartz was not certain whether Glenn would fall into that category because he was much older than all but one person in the data set on which the Static-99 was based. Schwartz testified: "We don't have a lot of data on 82-year-old-guys. When you look at the number of people in these data sets that are past 60, 75, 80, very, very few."
*791 Schwartz testified he initially did not believe Glenn qualified as an SVP because of his advanced age and because the qualifying offenses occurred a long time ago. Schwartz ultimately concluded Glenn was an SVP based on his score on the Static-99, the fact Glenn had continued to act out sexually, and Schwartz's opinion that pedophilia is a compulsive and chronic condition. Schwartz considered "the incidents in North Carolina and the indecent exposure in North Carolina as an indication that he was still ... sexually acting out and at risk." Despite studies suggesting recidivism rates for pedophiles decrease after age 60, Schwartz believed Glenn posed a risk of reoffending because he had engaged in serious acts of pedophilia at age 62.
Schwartz also diagnosed Glenn with exhibitionism.[3] Schwartz initially "wavered back and forth" on that diagnosis because it requires exposing oneself to unsuspecting strangers. Ultimately, Schwartz concluded the women in North Carolina who saw Glenn in fishnet underwear were strangers, thus satisfying the definition of exhibitionism.

C. Dawn Starr

Dawn Starr held a Ph.D. in psychology and had been a licensed psychologist for over 20 years when she testified. She served on the DMH's SVP panel of evaluators and had conducted over 1,000 SVP evaluations. She conducted an SVP evaluation of Glenn in July 2005 and conducted followup evaluations of him in August 2006 and September 2007.
Starr concluded Glenn committed qualifying predicate offenses, had a mental disorder predisposing him to commit future sexual offenses, and was likely to commit future sexually violent predatory offenses as a result of his mental disorder.
Starr diagnosed Glenn with "pedophilia, sexually attracted to male and female children, but a non-inclusive type, meaning he's had adult sexual partners." Starr testified, "[t]hat was an SVP diagnosis because I thought that he showed both volitional and emotional impairment with regards to that diagnosis." She believed Glenn was volitionally impaired because he "gets in very little trouble with the law" and "[i]s not a rule breaker," yet had serious difficulty controlling his sexual behavior. As to emotional impairment, Starr testified: "[H]e is taking advantage of these children, most of whom were either in situations where they were low income or the parents were maybe neglectful or not around very much. And he would groom them, give them candy, put on cartoons maybe and then switch over to sexually explicit *792 movies. Fix the boys' bikes. [ถ] And then he would sexually abuse them for his own personal gratification with little or no regard to the adverse consequences of these children."
Starr considered several nonqualifying crimes and victims because "under the diagnostic criteria ... we're supposed to look at whether the person has recurrent intense sexually arousing deviant fantasies or urges or behaviors towards prepubescent children. So I'm interested to see how many people or young children he's had sexual contact with over what period of time."
Starr's conclusion that Glenn committed the qualifying predicate offenses was based on his convictions in 1988 for committing lewd and lascivious acts with a child under the age of 14 involving the girl and the two boys. Starr also considered these nonqualifying crimes and victims in reaching her diagnosis:
In the 1950's or 1960's, one of Glenn's daughters reported that Glenn had sexually molested her when she was a child.
In 1976, when Glenn was 50 years old, he was arrested and charged with two counts of lewd and lascivious behavior with a child under 14 years old in violation of Penal Code former section 288. (Ultimately, he was convicted of contributing to the delinquency of a minor.)
In 1977, Glenn took a nine-year-old girl and a seven-year-old boy to Big Bear, where he exposed himself to them, bathed with them, fondled and orally copulated the girl, and had the boy use a relaxer on Glenn until he ejaculated.
In 1986, a mother left her three children with Glenn while she moved into a new home. Glenn licked the 10-year-old girl between the legs, then tried to "hypnotize" her. Glenn touched her six-year-old brother's penis.
In 1987, Glenn molested his seven-year-old granddaughter and four-year-old grandson. The granddaughter reported that Glenn carried her to the living room, put his hand over her mouth, pulled down her underwear, and touched her groin. The grandson reported that Glenn touched his penis.
Starr concluded Glenn currently suffers from pedophilia, despite his age, because it is a chronic and lifelong condition. Significant too, Starr found, was that Glenn used the victims for his own gratification, did not accept responsibility for his conduct, and showed no remorse.
Starr also diagnosed Glenn with exhibitionism, which she described as a type of paraphilia. Her diagnosis of exhibitionism was based on Glenn's *793 claim to be a nudist and a pattern of conduct in which he appeared to go out of his way to expose himself to others.
Starr concluded Glenn likely would engage in future sexually violent predatory behavior as a result of his mental disorder. Like Schwartz, Starr used the Static-99 and gave Glenn a total score of eight, placing him in the highest risk of reoffense category. She placed Glenn in the "rare group of people" who, despite advanced age, would continue to sexually reoffend. She considered Glenn's age, good health, and family history of longevity to conclude a five- to eight-year risk prediction period to be appropriate.
Starr believed Glenn's age lowered the risk of reoffense a little, but not enough to take Glenn out of the high risk category. She explained: "[H]e is exactly the same man he is today as he was when he committed the offenses in the late 1980s. His personality is the same; his attitude about them is the same. Either it was no big deal or I did not do it. [ถ] He has not done anything to try to get treatment for that in the community or now that it's available to him at absolutely no cost where he's staying. He doesn't go do that. He is in pretty good physical health. He has good mental capacity. So the only thing is, he is a little older and he is still sexually preoccupied."

D. Glenn

The deputy district attorney called Glenn as an adverse witness. He testified he was a nudist and denied committing all but one of the qualifying and nonqualifying offenses.
Glenn claimed he had been falsely accused in each instance and gave various reasons why. As to the incident in Big Bear in 1977, Glenn claimed the mother told her children to accuse Glenn of molesting them because he had kicked her out of his house. As for the incident in 1986, Glenn claimed the 10-year-old girl made obscene telephone calls to him, and falsely accused him of molestation for fear he would tell her mother about the calls. Glenn denied molesting his grandchildren, claiming his son had been "wasted on drugs."
Glenn asserted he did not commit the crimes for which he was convicted in 1989. Glenn claimed the two boys came over to his house to repair their bicycles. Glenn showered, and when he came out of the shower, the boys were on his bed watching a pornographic video and the 11-year-old boy had an erection. Glenn claimed he ran the boys out of the house. According to Glenn, the pornographic video belonged to a friend.
As for the conviction involving the girls, Glenn testified they would come into his apartment without knocking. On one occasion, he stepped out of the *794 shower to find three girls in his bathroom looking at him. On another occasion, one of the girls walked into his apartment, unannounced, and Glenn, a nudist, was naked. The girl said, "[g]et some clothes on"; Glenn replied, "you better start getting use to it if you don't start knocking."
Glenn was arrested, convicted by two separate juries, and sent to prison. He was released in 1995, and, in 1998, bought two acres of land in North Carolina, where he continued to practice nudism. He contended Hart's mother would hide in the bushes with binoculars to watch him naked. She had tried to "put the make on [him]," but he was not interested in her, and she complained to the police in anger. According to Glenn, none of the 13 people who complained to the police about his nudity had ever seen him naked. He also claimed Hart's testimony that Glenn had asked about finding a young boy to work for him was a lie.
On the day the women came by to inspect property, Glenn wore the fishnet underwear because "from a distance it just looks like regular shorts." He did not expect he would have to step down from his backhoe to see anyone.
Glenn testified he had been impotent since undergoing chemotherapy for colon cancer in 1996. He testified he loved children, and "[w]hen I see children with a problem, my heart bleeds for them."

II.

Defense Case
Glenn called licensed clinical psychologists Brian Abbott and Craig Updegrove to testify on his behalf.

A. Brian Abbott

Brian Abbott testified he was a licensed clinical psychologist, had a forensic psychological practice, and primarily evaluated sex offenders, including SVP's.
Abbott reviewed Glenn's medical and hospital records, law enforcement reports, probation reports, DMH evaluator reports, and investigative reports prepared by the district attorney's office and by the public defender's office. Abbott interviewed Glenn three times, and administered a general personality test, the Millon Clinical Multiaxial Inventory-III, The Abel Assessment for sexual interest-2, and a cognitive functioning test.
*795 Abbott concluded, "[t]here's absolutely no information to substantiate a current diagnosis of pedophilia or to substantiate a current mental disorder under the Sexually Violent Predator Act." In reaching that conclusion, Abbott observed that Glenn had displayed no symptoms of sexual interest in children for 20 years and found it critical that no reports were made of Glenn engaging in inappropriate conduct with children during the seven-year period in which he was not in custody. There was no evidence that, since Glenn had been committed as an SVP, he had engaged in the type of conduct typical of someone with a current diagnosis of pedophilia. Because Glenn interacted sexually with both adults and children, Abbott believed his conduct might be the result of sexual compulsiveness rather than pedophilia.
Abbott testified that sex drive decreases dramatically in people over 50 years old. He acknowledged pedophilia is a chronic condition for some people, but testified it was not chronic in Glenn's case. He found no indication that Glenn currently had any sexual interest in prepubescent children and was not likely to reoffend in a sexually violent manner. Abbott declined to diagnose Glenn with exhibitionism because he did not expose himself for sexual gratification or to unsuspecting strangers.

B. Craig Updegrove

Craig Updegrove held a Ph.D. in clinical psychology, was a licensed psychologist, and, since 1996, had served on the DMH's panel of SVP evaluators.
Under appointment by the DMH, Updegrove conducted an evaluation of Glenn in July 2005. Updegrove concluded Glenn did commit the qualifying offenses, had a diagnosable mental disorder within the meaning of the SVPA, but was not likely to reoffend in a sexually violent, predatory manner.
Updegrove reached the same conclusions after reevaluating Glenn in October 2006. Again diagnosing Glenn as having pedophilia, Updegrove acknowledged, "he's had this recurrent pattern of sexually aroused behavior around prepubescent children" and recognized Glenn's score on the Static-99 placed him in the high risk of reoffense category.
Updegrove concluded nonetheless that Glenn did not pose a serious and well-founded risk of sexually reoffending. In reaching that conclusion, Updegrove considered Glenn's age, the lack of evidence of offending behavior after 1988, and chemotherapy in 1996, which, according to Glenn, had left him impotent. Updegrove found it significant that Glenn had no known sexual offenses against children in the eight-year period from his release from prison to his conviction for indecent exposure. Updegrove did not diagnose *796 Glenn with exhibitionism because he found no evidence that Glenn exposed himself in North Carolina for sexual gratification.

APPELLATE AND HABEAS CORPUS PROCEDURAL HISTORY
In February 2008, the jury found Glenn to be an SVP, and the trial court ordered him committed for an indeterminate term. Glenn timely appealed from the commitment order. In October 2008, he filed a petition for writ of habeas corpus in the trial court. The trial court denied the petition stating: "Petitioner's claims are currently being adjudicated within the Court of Appeal. There is nothing contained in the Petition to substantiate Petitioner's claims. A Petition for Writ of Habeas Corpus cannot serve as a substitute for Appeal."
In November 2008, Glenn, representing himself in propria persona, filed a petition for writ of habeas corpus in this court, challenging the validity of the SVPA commitment petition on the ground the evaluations were based on an invalid standardized assessment protocol. We issued an order to show cause, consolidated the writ petition with the appeal, and invited the Attorney General to file a combined respondent's brief and return to the petition.

DISCUSSION

I.

The Trial Court Did Not Err by Sustaining Objections to Abbott's Testimony.
Glenn argues the trial court erred by precluding Abbott from testifying about studies and research conducted by other mental health experts concerning whether pedophilia is chronic. Glenn contends such testimony was admissible to establish the basis for Abbott's expert opinion. Relying on People v. Campos (1995) 32 Cal.App.4th 304 [38 Cal.Rptr.2d 113] (Campos), the Attorney General argues an expert witness may not testify on direct examination to the contents of reports or opinions expressed by other experts. We conclude the trial court did not err.

A. Background

During Abbott's direct examination by Glenn's counsel, the following colloquy occurred:
"A [Abbott] ... First, you have to prove the fact that they do have what they refer to as pedophiliac arousal. You have to first be able to show that the *797 individual was sexually aroused toward prepubescent children, and then if they act upon that, then you can make the diagnosis. You cannot make the diagnosis based on the number of prepubescent victims over time. In fact, one of the criteria text editorsโ
"Ms. Norman [deputy district attorney]: Objection.
"The Court: Sustained.
"Q (By Mr. Lowry [Glenn's counsel]:) Have you read documents that indicate to you that behavior alone is not enough to make the diagnosis of pedophilia?
"Ms. Norman: Objection, your Honor. May we approach?
"The Court: Yes."
The court did not immediately rule on the second objection.
Later, Abbott testified he did not subscribe to the belief that pedophilia is chronic. When he was asked to explain, the following transpired:
"A [Abbott] Because essentially when you look at the literature from which that statement is made, it goes back to I think really the early 1990's when the last major revision of the DSM Four [American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000)] happened, at least as it relates to diagnosis of pedophilia. In fact, there was an author by the name of Michael Seto who published a chapter in a book that came out three weeks ago where he states that this idea of pedophilia being tending to be chronic reallyโ
"Ms. Norman: Objection, your Honor.
"The Court: Sustained.
"Mr. Lowry: Okay.
"Ms. Norman: Move to strike.
"The Court: The testimony with regard to what the other doctor testified to would be stricken.
"Mr. Lowry: Okay.
*798 "Q (By Mr. Lowry:)... In the literature, is there an indication that there's a question as to whether or not pedophilia is chronic?
"Ms. Norman: Objection. Same objection.
"The Court: Sustained.
"The witness [Abbott]: Yes.
"Ms. Norman: Move to strike.
"The Court: The answer will be stricken."
A few moments later, the court overruled a similar objection but advised Glenn's counsel to "be careful in this area."
Outside the jury's presence, the court and counsel discussed whether Abbott could testify about studies and research conducted by other mental health experts concerning whether pedophilia is chronic. Glenn's counsel announced that, over the lunch break, he and Abbott had pared down a PowerPoint presentation to 22 "slides," all of which were graphs taken from studies, and argued Abbott should be permitted to testify about the slides as part of the basis for his opinion: "It just makes no sense for him not to be able to use at least these [P]ower[P]oint slides having to do with plotting of graphs and the statistics in order to aid his testimony." The deputy district attorney objected on the ground the material in the PowerPoint presentation had not been produced in discovery.
The trial court stated: "I still think that this is a Campos issue. If you have a graph, for instance, Graph A, and at the bottom it looks like we have `age' is the input. And on the left-hand side we have `percentages[,'] six-year rate of recidivism. [ถ] Just because something is in a graph, you're still trying to get in the opinion of this expert via a graph, it's just not coming in via Dr. Abbott testifying about it. It's still the same thing. It's still going to be hearsay that [the People] cannot cross[-]examine Doctor Milloy on this graph. So we still have the same issue." (Italics added.) The court explained Abbott could testify to his own opinions and even use the graphs prepared by the nontestifying experts, if he deleted the nontestifying experts' names. The court stated: "If it's his opinion, he can relate it, because that's his opinion based upon his training, his expertise, his evaluation, and how it relates to Mr. Glenn based upon his evaluation of Mr. Glenn. He can testify to that. [ถ] He just can't testify and throw up on the screen `this is Milloy's opinion with regards to six-year recidivism rates.' That he can't do. But he may be able to give the same information in [it] if it's his opinion in a different way."

*799 B. Case Law Regarding Admissibility of Nontestifying Experts' Studies and Opinions

(1) In Campos, supra, 32 Cal.App.4th at page 306, the defendant appealed a jury determination he was a mentally disordered offender. The defendant argued the trial court erred by permitting the prosecution's expert psychiatrist, Dr. Mertz, to testify that she relied on other medical evaluations of the defendant and that the evaluations confirmed her opinion he was a mentally disordered offender. (Id. at p. 307.) The appellate court agreed. A psychiatrist, like other expert witnesses, may rely on reliable hearsay, including the statements and reports of other treating professionals in forming an opinion, and, on direct examination, may testify the reports of the other experts were a basis for that opinion. (Id. at pp. 307-308.) However, an expert witness may not, on direct examination, reveal the contents of the other experts' reports or opinions expressed in the reports. (Id. at p. 308.) "Here, the reports of the nontestifying experts were hearsay. Doctor Mertz was properly allowed to testify that she relied upon the reports in forming her own opinions. The trial court erred, however, when it allowed her to reveal their content on direct examination by testifying that each prior medical evaluation agreed with her own opinion." (Ibid.) While doctors can testify about the basis for their opinion, they cannot disclose to the jury the opinions of out-of-court doctors. (Ibid.) The appellate court nonetheless affirmed because, it concluded, Dr. Mertz's testimony about prior medical evaluations was not prejudicial. (Id. at pp. 308-309.)
Glenn argues Campos is inapplicable because the nontestifying experts in that case had evaluated and prepared reports on the defendant. Here, in contrast, Abbott was precluded from testifying about nontreating experts' opinions on whether pedophilia in general is a chronic condition.
Campos is the product of a line of authority starting with Kelley v. Bailey (1961) 189 Cal.App.2d 728 [11 Cal.Rptr. 448], in which the court held a testifying physician could not rely on a report of another physician as independent proof of facts, but could rely on it as part of the basis on which the testifying physician formed a diagnosis and course of treatment. (Id. at pp. 737-738.) On request, the jury should be given a limiting instruction that the hearsay is admitted as the basis for the testifying physician's diagnosis, not to prove the truth of what the patient told the original physician. (Id. at p. 738.)
(2) The California Supreme Court adopted this general rule in Whitfield v. Roth (1974) 10 Cal.3d 874, 894-895 [112 Cal.Rptr. 540, 519 P.2d 588], stating: "It is obvious that the testimony concerning the opinion of the other doctors who were not present in court, and who had not been qualified as *800 experts was hearsay. `"The reason for this is obvious. The opportunity of cross-examining the other doctors as to the basis for their opinion, etc., is denied the party as to whom the testimony is adverse."' [Citations.] [ถ] Defendants contend, however, that the testimony concerning the opinions of the other doctors was admissible to show the basis of the testifying doctor's opinion under the doctrine of limited admissibility as applied in Kelley [v.] Bailey .... This rule has no application to the case at bench for two reasons. First, the opinions of the out-of-court doctors in this case were not used by either testifying doctor in the course of treatment or diagnosis of plaintiff. They were consulted as experts and then called as witnesses to offer expert opinion evidence. It is clear that doctors can testify as to the basis of their opinion [citation], but this is not intended to be a channel by which testifying doctors can place the opinion of innumerable out-of-court doctors before the jury." (Fn. omitted.) The court held the testimony concerning the opinion of the nontestifying doctors was inadmissible on the ground it was being offered as independent proof of the fact in issueโthat an X-ray of the patient's skull showed no abnormality. (Id. at p. 895.)
In People v. Coleman (1985) 38 Cal.3d 69, 92 [211 Cal.Rptr. 102, 695 P.2d 189], the Supreme Court expressed the rule: "`While an expert may state on direct examination the matters on which he relied in forming his opinion, he may not testify as to the details of such matters if they are otherwise inadmissible. [Citations.] The rule rests on the rationale that while an expert may give reasons on direct examination for his opinions, including the matters he considered in forming them, he may not under the guise of reasons bring before the jury incompetent hearsay evidence. [Citation.]'"
These cases permit an expert witness to testify about the contents or details of the matters on which the expert relied, including the opinions of nontestifying experts, if those matters and opinions are otherwise admissible. If the contents or details of the matters on which the expert relied, including the opinions of nontestifying experts, are otherwise inadmissible, for example, they are offered to prove the truth of a fact in issue, they may not be disclosed.
An illustrative and analogous case is Mosesian v. Pennwalt Corp. (1987) 191 Cal.App.3d 851 [236 Cal.Rptr. 778]. In that case, the plaintiff, the owner of a vineyard, alleged a pesticide manufactured by the defendant caused chemical burning of grape leaves leading to defoliation and crop destruction. (Id. at p. 855.) The defendant's expert testified the pesticide did not chemically burn the leaves on the plaintiff's grapevines. (Id. at pp. 856-857.) During the course of direct examination, the expert testified he had consulted with six other experts about the potential of the pesticide to cause leaf burn and had based his own opinion in part on those other experts' opinions. (Id. at *801 p. 856.) None of the six other experts testified. (Id. at p. 857.) Also on direct examination, the expert revealed those experts had concluded the defendant's pesticide could not cause more than marginal leaf burn. (Id. at pp. 857, 863.) The trial court permitted the testimony but admonished the jury the nontestifying experts' opinions could only be considered as part of the basis for the testifying expert's opinion and could not be considered as proof the pesticide did not damage the plaintiff's vineyard. (Id. at p. 857.) The jury returned a defense verdict, and the trial court granted the plaintiff's motion for a new trial. (Id. at p. 858.)
The Court of Appeal concluded the testifying expert's testimony on the opinions of the nontestifying experts was inadmissible hearsay because the opinions were offered for the truth of the matter assertedโthat the defendant's pesticide did not cause more than marginal leaf burn. "The fundamental issue that stood as the cornerstone of the entire trial was whether the plaintiff suffered a crop loss. The introduction of the hearsay opinions through [the defense expert] touched upon only one aspect of economic crop loss. Can [the pesticide] ever cause leaf burn and does leaf burn lead to a loss of production? If the leaf burn complained of by the plaintiff could only be marginal, then the probability of economic loss was remote." (Mosesian v. Pennwalt Corp., supra, 191 Cal.App.3d at p. 866.) But the Court of Appeal reversed the order granting a new trial, concluding admission of the hearsay opinions was harmless error because the opinions touched on only one issue in the case, the great weight of the evidence supported the defense verdict, and the trial court had admonished the jury. (Id. at pp. 866-867.)
In Mosesian v. Pennwalt Corp., the nontestifying experts did not opine whether the pesticide damaged the plaintiff's vineyard; rather, they opined whether the pesticide could ever cause leaf burn. Their opinions were inadmissible because they were offered to prove a disputed factโwhether the pesticide could cause leaf burn, and thus might have damaged the plaintiff's vineyard.

C. Application to This Case

(3) Here, the nontestifying experts'[4] opinions and studies related to whether pedophilia in general is chronic. The only conceivable purpose of offering the opinions and studies of Seto, Milloy, and other nontestifying *802 experts (via the PowerPoint presentation) was to prove the truth of a disputed factโwhether pedophilia is chronic, and, thus, whether Glenn could still suffer from it. Although Abbott could testify to his own opinions and describe the matters he considered in reaching those opinions, he could not testify to the opinions of the other nontestifying experts, explain or read their writings, or present graphs and charts revealing their opinions that were otherwise inadmissible.
Glenn argues, "if the testimony relating to Michael Seto as to whether or not pedophilia is a chronic disorder and the use of the graph prepared by Milloy was invalid then it was equally invalid to introduce Dr. Hanson's opinion as to [Glenn]'s likely recidivism rate thr[ough] the use of the STATIC-99." But neither in appellant's opening brief nor in appellant's reply brief, does Glenn include record citations supporting that argument. Glenn concedes nobody objected to the challenged testimony, and, therefore, any claim of error has been forfeited.
(4) In addition, "[b]ecause an expert's need to consider extrajudicial matters, and a jury's need for information sufficient to evaluate an expert opinion, may conflict with an accused's interest in avoiding substantive use of unreliable hearsay, disputes in this area must generally be left to the trial court's sound judgment." (People v. Montiel (1993) 5 Cal.4th 877, 919 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) The trial court may exclude from an expert's opinion testimony any hearsay matter if its probative value is outweighed by its irrelevance, unreliability, or potential prejudice. (People v. Catlin (2001) 26 Cal.4th 81, 137 [109 Cal.Rptr.2d 31, 26 P.3d 357].) The trial court did not abuse its discretion in sustaining the objections to the PowerPoint presentation.

II.

Use of an Invalid Standardized Assessment Protocol Did Not Deprive the Trial Court of Fundamental Jurisdiction; Therefore, a Harmless Error Analysis Applies, and Glenn Suffered No Prejudice.
Glenn argues his commitment as an SVP was illegal because the evaluations leading to the SVPA commitment petition were based on the mental health assessment protocol later determined by the OAL to be invalid as "underground regulations." The Attorney General does not defend the challenged assessment protocol. Instead, the Attorney General argues (1) Glenn forfeited the issue by failing to object at the probable cause hearing held pursuant to section 6602, subdivision (a), and (2) any error in using the assessment protocol was harmless.
*803 Glenn did not forfeit the issue, but use of the invalid assessment protocol did not deprive the trial court of fundamental jurisdiction. Glenn therefore must show he was deprived of a fair trial or suffered prejudice as a result of the use of the assessment protocol.

A. Deficiencies in the Return to the Habeas Corpus Petition

First, we address Glenn's argument the Attorney General admitted the allegations of the petition for writ of habeas corpus by not filing a formal response admitting or denying the petition's allegations.
In People v. Duvall (1995) 9 Cal.4th 464, 474-481 [37 Cal.Rptr.2d 259, 886 P.2d 1252] (Duvall), the California Supreme Court thoroughly explained habeas corpus rules and procedures. The Duvall court explained the function and requirements of the return: "[W]e have required the return to `allege facts tending to establish the legality of petitioner's detention.' [Citations.] Those facts are not simply the existence of a judgment of conviction and sentence when the petitioner challenges his restraint in prison. The factual allegations of a return must also respond to the allegations of the petition that form the basis of the petitioner's claim that the confinement is unlawful. [Citations.] In addition to stating facts, the return should also, `where appropriate, . . . provide such documentary evidence, affidavits, or other materials as will enable the court to determine which issues are truly disputed.'" (Id. at p. 476, fn. omitted.)
In County of San Bernardino v. Superior Court (1994) 30 Cal.App.4th 378, 382, footnote 6 [35 Cal.Rptr.2d 760], the respondents filed a document called "`responsive brief'" that did not respond to the formal allegations of the petition. The Court of Appeal noted its order issuing an alternative writ requested a formal return, meaning an answer or a demurrer. (Ibid.) By filing a responsive brief, the respondents did not follow the correct procedures. (Ibid.)
Although the Attorney General's combined respondent's brief and return does not respond to the allegations of the habeas corpus petition by admitting or denying them, that does not mean Glenn is entitled to habeas corpus relief. From the petition and the combined respondent's brief and return, we can tell the relevant facts in this case are essentially not in dispute. The contested issuesโwhether the assessment protocol is an underground regulation and whether use of the invalid assessment protocol deprived the trial court of fundamental jurisdictionโare legal ones. The return could not formally respond to issues of prejudice or deprivation of a fair trial because the habeas corpus petition made no such allegations. In the combined respondent's brief *804 and return, the Attorney General argues Glenn suffered no prejudice and received a fair trial, thus framing those issues for our review.

B. 2008 OAL Determination No. 19

A proceeding under the SVPA begins when prison officials screen an inmate's records to determine whether the inmate is likely to be an SVP. If so, the inmate is referred to the DMH for a full evaluation to determine whether he or she meets the SVP criteria under section 6600. (ง 6601, subd. (b).) Two mental health professionals designated by the DMH (ง 6601, subd. (d)) "shall evaluate the person in accordance with a standardized assessment protocol, developed and updated by the State Department of Mental Health, to determine whether the person is a sexually violent predator as defined in this article. The standardized assessment protocol shall require assessment of diagnosable mental disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders. Risk factors to be considered shall include criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder" (ง 6601, subd. (c)). If the evaluators agree the person meets those criteria, the director of the DMH must forward a request for a commitment petition to the county where that person was convicted. (ง 6601, subd. (d).)
The mental health evaluators who performed the section 6601 evaluations of Glenn followed the Clinical Evaluator Handbook and Standardized Assessment Protocol issued by the DMH.
Government Code section 11340.5, subdivision (a) provides: "No state agency shall issue, utilize, enforce, or attempt to enforce any guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule, which is a regulation as defined in [Government Code] Section 11342.600, unless the guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule has been adopted as a regulation and filed with the Secretary of State pursuant to this chapter." A regulation enacted in violation of the Administrative Procedure Act, Government Code section 11340 et seq. (APA), is invalid. (Morning Star Co. v. State Bd. of Equalization (2006) 38 Cal.4th 324, 340 [42 Cal.Rptr.3d 47, 132 P.3d 249].)
In August 2008, the OAL issued a determination that various challenged portions of the standardized assessment protocol used by the DMH for SVPA evaluationsโspecifically, the Clinical Evaluator Handbook and Standardized Assessment Protocol (2007)โmet the statutory definition of a regulation and, therefore, should have been adopted pursuant to the APA, Government Code *805 section 11340.5.[5] (2008 OAL Determination No. 19, supra, at pp. 1, 13.) The OAL determined that, as such, the protocol constituted an underground regulation as defined in California Code of Regulations, title 1, section 250 and is therefore invalid.[6] (2008 OAL Determination No. 19, supra, at p. 13.)
The 2008 OAL Determination No. 19 concerned only whether the assessment protocol constituted a regulation under Government Code section 11342.600 and stated, "[n]othing in this analysis evaluates the advisability or the wisdom of the underlying action or enactment." (2008 OAL Determination No. 19, supra, at p. 1.) The 2008 OAL Determination No. 19 advised that the OAL "has neither the legal authority nor the technical expertise to evaluate the underlying policy issues involved in the subject of this determination." (Ibid.)
The Attorney General does not contest the OAL's determination that the 2007 standardized assessment protocol is invalid. Given the Attorney General's position, we assume, but do not decide, that assessment protocol is invalid as an underground regulation.[7] We also will presume the assessment protocol used for Glenn's evaluations was not materially different from the one determined to be invalid by the OAL.

C. Forfeiture

Challenges based on noncompliance with statutory requirements and regulations pertaining to evaluators should be raised in the trial court. (See People v. Superior Court (Ghilotti) (2002) 27 Cal.4th 888 [119 Cal.Rptr.2d 1, 44 P.3d 949] (Ghilotti) [challenges to SVPA commitment petition based on noncompliance with statutory requirement of concurring evaluators' opinions should be raised in trial court]; In re Wright (2005) 128 Cal.App.4th 663, 672 *806 [27 Cal.Rptr.3d 281] (Wright) [question whether evaluator had requisite degree in psychology was an "evidentiary issue . . . properly left to the trial court"].) In People v. Medina (2009) 171 Cal.App.4th 805, 817 [89 Cal.Rptr.3d 830] (Medina), the court held the defendant SVP forfeited a challenge to the validity of the assessment protocol as an underground regulation by failing to raise the issue in the trial court.
Although Glenn did not challenge the validity of the assessment protocol in the trial court, his petition for writ of habeas corpus alleges 2008 OAL Determination No. 19 is "`newly discovered' evidence" justifying habeas corpus relief. The Attorney General does not deny that allegation. (See Duvall, supra, 9 Cal.4th at p. 476.) Accordingly, we find no forfeiture.

D. Fundamental Jurisdiction

1. The Pompa-Ortiz Rule

(5) In People v. Pompa-Ortiz (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941] (Pompa-Ortiz), the California Supreme Court held illegalities in criminal preliminary hearings that are not "jurisdictional in the fundamental sense" are not reversible per se on an appeal following the subsequent trial. Rather, such illegalities must be reviewed "under the appropriate standard of prejudicial error and shall require reversal only if defendant can show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination." (Ibid.)
Under Pompa-Ortiz, "[t]he right to relief without any showing of prejudice will be limited to pretrial challenges of irregularities. At that time, by application for extraordinary writ, the matter can be expeditiously returned to the magistrate for proceedings free of the charged defects." (Pompa-Ortiz, supra, 27 Cal.3d at p. 529.) "In other words, a defendant who feels he has suffered error at his preliminary hearing can seek to correct that error by filing a pretrial writ petition. If he does not, and elects to go to trial, the error at the preliminary hearing can only lead to reversal of the conviction if the error created actual prejudice." (People v. Hayes (2006) 137 Cal.App.4th 34, 50 [39 Cal.Rptr.3d 747] (Hayes).)
The Pompa-Ortiz rule apples to denial of substantive rights and technical irregularities in proceedings, including SVPA proceedings. (Hayes, supra, 137 Cal.App.4th at pp. 50-51; Wright, supra, 128 Cal.App.4th at p. 673; People v. Talhelm (2000) 85 Cal.App.4th 400, 405 [102 Cal.Rptr.2d 150].)
The term "jurisdictional in the fundamental sense" means the "legal power to hear and determine a cause." (Pompa-Ortiz, supra, 27 Cal.3d at p. 529.) *807 "Lack of jurisdiction in its most fundamental or strict sense means an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties." (Abelleira v. District Court of Appeal (1941) 17 Cal.2d 280, 288 [109 P.2d 942].) When a court lacks fundamental jurisdiction, the judgment is void and therefore vulnerable to direct or collateral attack at any time. (People v. American Contractors Indemnity Co. (2004) 33 Cal.4th 653, 660 [16 Cal.Rptr.3d 76, 93 P.3d 1020].)

2. Analysis of SVPA and Case Authority

We hold the use of the invalid assessment protocol to conduct Glenn's evaluations did not deprive the trial court of the legal power to hear and determine the subsequently filed SVPA commitment petition. Our conclusion is based on our analysis of a recent case reaching the same conclusion, the SVPA statutory scheme, and cases addressing analogous situations involving defective SVP evaluations.

a. Medina

In Medina, supra, 171 Cal.App.4th 805, the Court of Appeal concluded use of the invalid assessment protocol in conducting SVPA intake evaluations did not deprive the trial court of fundamental jurisdiction over the subsequently filed SVPA commitment petition. The defendant in Medina had been initially committed as an SVP in 2001. (Medina, supra, 171 Cal.App.4th at p. 810.) Years later, the defendant admitted the allegations of a recommitment petition and consented to an order of indefinite commitment. (Id. at p. 811.) The defendant appealed from the recommitment order but argued the original commitment order was void because it was based on an evaluation conducted pursuant to the assessment protocol ruled invalid by 2008 OAL Determination No. 19. (Medina, supra, 171 Cal.App.4th at pp. 810-811.)
The Court of Appeal rejected that argument, explaining: "Although [the defendant] contends that the initial trial court lacked `fundamental' jurisdiction over his petition, thereby producing a void judgment, his claim does not call into question the court's personal or subject matter jurisdiction. As to personal jurisdiction, there is no evidence to suggest, and [the defendant] does not contend, that he lacked minimum contacts with the State of California [citation] or that he was not served with the documents necessary to initiate the proceedings. [Citations.] As to subject matter jurisdiction, the superior court was undoubtedly the appropriate court to hear the commitment petition [citations], and there is no claim of untimeliness. [Citation.]" (Medina, supra, 171 Cal.App.4th at p. 816.) The argument that evaluations based on invalid assessment protocols are a procedural prerequisite to jurisdiction, was, the court stated, "an argument that the court acted in excess of its jurisdiction, rather than without fundamental jurisdiction." (Ibid.)
*808 Glenn's jurisdictional challenge likewise does not question the trial court's personal or subject matter jurisdiction. There is no question the trial court in this case was the appropriate court to hear the SVPA commitment petition, and Glenn makes no claim of untimeliness.

b. The SVPA Statutory Scheme

Nothing in the SVPA states or suggests a trial court lacks fundamental jurisdiction over an SVPA commitment petition when the underlying evaluations are based on an assessment protocol found to be invalid under the APA.[8] Under the SVPA, the DMH must "evaluate the person in accordance with a standardized assessment protocol, developed and updated by the State Department of Mental Health, to determine whether the person is a sexually violent predator . . . ." (ง 6601, subd. (c).) The evaluations form the basis on which the DMH decides whether it must forward to the appropriate county's designated counsel a request to file an SVPA commitment petition. (ง 6601, subd. (d).) However, the "`requirement for evaluations is not one affecting disposition of the merits; rather, it is a collateral procedural condition plainly designed to ensure that SVP proceedings are initiated only when there is a substantial factual basis for doing so.'" (People v. Scott (2002) 100 Cal.App.4th 1060, 1063 [123 Cal.Rptr.2d 253].)
The county's designated counsel decides whether to file a petition for commitment. (ง 6601, subd. (d).) The filing of an SVPA commitment petition, not the assessment evaluations, invokes the court's jurisdiction over the matter. "[N]oncompliance with the procedural prerequisites of the [SVPA], such as failure to have two written psychological examinations, did not deprive the trial court of jurisdiction." (People v. Ward (2002) 97 Cal.App.4th 631, 634 [118 Cal.Rptr.2d 599].)
*809 The SVPA does not require the petition to allege the existence of or append the two assessment evaluations. (ง 6600.) "Although the DMH is required to send the two psychological evaluations to the county's designated counsel, and the designated counsel is given discretion to file a petition if he agrees with the DMH's recommendation (ง 6601, subds. (h), (i)), the statute does not by its terms require that the evaluations be alleged or appended to a petition." (People v. Superior Court (Preciado) (2001) 87 Cal.App.4th 1122, 1128 [105 Cal.Rptr.2d 159] (Preciado).)

c. Cases Addressing Analogous Situations

In Preciado, the Court of Appeal rejected the argument that the failure to obtain two evaluations deprived the trial court of jurisdiction to proceed on an SVPA commitment petition. (Preciado, supra, 87 Cal.App.4th at pp. 1127-1128.) The court held the SVPA does not require the petition to allege the existence of the two assessment evaluations and, therefore, the petition was valid at the time it was filed despite the lack of two evaluations. (Preciado, supra, 87 Cal.App.4th at p. 1128.) Although the petition was subject to attack on that ground, the court concluded, "this defect was not one going to the substantive validity of the complaint" and the failure to obtain evaluations "was merely in the nature of a plea in abatement, by which a defendant may argue that for collateral reasons a complaint should not proceed." (Ibid.) "In general, where a defect impairing a litigant's right to proceed existed at the time a complaint was filed but has been cured by the time the defense is raised, the defect will be ignored." (Ibid., citing 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, ง 1058, p. 508.)
The Preciado court explained: "[N]othing on the face of the statute requires a petition to allege the existence of two psychological evaluations, and the statute does not require the People to prove the existence of such evaluations at either the probable cause hearing or at trial. . . . [O]nce the petition is filed a new round of proceedings is triggered. [Citation.] After the petition is filed, rather than demonstrating the existence of the two evaluations, the People are required to show the more essential fact that the alleged SVP is a person likely to engage in sexually violent predatory criminal behavior. [Citation.] In short, like many other matters subject to the principles governing pleas in abatement, the requirement for evaluations is not one affecting disposition of the merits; rather, it is a collateral procedural condition plainly designed to ensure that SVP proceedings are initiated only when there is a substantial factual basis for doing so." (Preciado, supra, 87 Cal.App.4th at p. 1130, fn. omitted; see also People v. Scott, supra, 100 Cal.App.4th at p. 1063.)
(6) Preciado stands for the proposition that assessment evaluations of two concurring health professionals, though a requirement for filing an SVPA *810 commitment petition, are not a condition to the trial court's jurisdiction over the petition and do not affect the petition's substantive validity. Defective evaluations, or the failure to obtain them, can be cured later by producing valid evaluations, or by establishing the defendant satisfies the statutory definition of an SVP. Similarly here, assessment evaluations based on a valid standardized assessment protocol, though a requirement for filing an SVPA commitment petition, are not a condition to a trial court's jurisdiction over an SVPA commitment petition and do not affect the petition's substantive validity.
Wright, supra, 128 Cal.App.4th 663, presents an analogous situation in which one of two evaluations was defective. In Wright, the two evaluators selected by the DMH could not agree whether the defendant met the SVP criteria. (Id. at p. 668.) As a result, two independent evaluators were appointed, and they concluded the defendant met the SVP criteria. (Ibid.) Subsequently, an SVPA petition was filed and a jury found the defendant was an SVP. (128 Cal.App.4th at pp. 667, 669.) After obtaining information suggesting one of the two independent evaluators lacked the education and experience qualifications required by section 6601, subdivision (g),[9] the defendant filed a petition for writ of habeas corpus alleging he was deprived of due process because one of the two evaluations supporting the SVPA commitment petition was defective. (Wright, supra, 128 Cal.App.4th at pp. 667, 669, 673.)
The Court of Appeal assumed for purposes of analysis the challenged evaluator was not qualified to conduct the secondary evaluation under subdivision (g) of section 6601. (Wright, supra, 128 Cal.App.4th at p. 672.) The court concluded any defect in the evaluations was harmless and likened the defect in the evaluation to an illegality in a pretrial commitment proceeding, which is not jurisdictional in a fundamental sense. (Id. at p. 673.) Under the Pompa-Ortiz rule, reversal was not required unless the defendant could show he was deprived of a fair trial or suffered prejudice as a result of the defective evaluation. (Wright, supra, 128 Cal.App.4th at p. 673.)
(7) An evaluation based on an assessment protocol later determined to be an underground regulation is similar to an evaluation prepared by an evaluator later found to have lacked the statutorily required education and experience qualifications. In both cases, the evaluation arguably is defective. In either case, the defendant may challenge the SVPA commitment petition at the time of the probable cause hearing by motion to dismiss asserting the *811 petition was the product of defective evaluations. (Wright, supra, 128 Cal.App.4th at p. 673.) An evaluation based on an invalid assessment protocol, like an evaluation prepared by an evaluator without the requisite education and experience qualifications, does not deprive the trial court of the power to hear or determine the SVPA commitment petition.

d. Ghilotti and People v. Allen
Glenn cites Ghilotti, supra, 27 Cal.4th 888 and People v. Allen (2007) 42 Cal.4th 91 [64 Cal.Rptr.3d 124, 164 P.3d 557], as supporting his argument that evaluations based on the invalid assessment protocol deprived the court of fundamental jurisdiction. In Ghilotti, the evaluations performed under section 6601, subdivisions (c) through (f) did not produce the concurrence of two designated evaluators under section 6601, subdivision (d), or of two independent professionals under section 6601, subdivisions (e) and (f), that the defendant met the criteria for commitment. (Ghilotti, supra, 27 Cal.4th at p. 905.) Notwithstanding the lack of concurring evaluations, the district attorney, at the request of the DMH director, filed a petition for recommitment. (Id. at pp. 893-894.) The trial court dismissed the petition, and the Court of Appeal denied a petition for writ of mandamus to vacate that dismissal order. (Id. at pp. 899-900.)
The Supreme Court concluded an SVPA commitment or recommitment petition cannot be filed unless two mental health professionals agree the person qualifies as an SVP. (Ghilotti, supra, 27 Cal.4th at p. 894.) The court analyzed all the subdivisions of section 6601 together and concluded, "[t]he clear import of this scheme" is the DMH's determination whether to request the filing of a commitment petition is governed by the evaluation procedures. (Ghilotti, supra, 27 Cal.4th at p. 906.) If the two designated mental health professionals do not agree the person meets the criteria for commitment, and the two independent professionals also do not agree the person meets the criteria for commitment, then "the [DMH] Director may not request the filing of a petition," and the district attorney may not file one. (Id. at pp. 907, 909.)
Glenn argues that under Ghilotti, the district attorney here could not file an SVPA commitment petition because the evaluators followed an assessment protocol later determined to be invalid. To the contrary, Ghilotti supports the proposition that legally erroneous evaluations do not deprive the trial court of fundamental jurisdiction over a commitment petition. In Ghilotti, the Supreme Court concluded the trial court may review an evaluator's assessment for legal error and, if the court finds material legal error on the face of the report, must direct "that the erring evaluator prepare a new or corrected report applying correct legal standards." (Ghilotti, supra, 27 Cal.4th at p. 895.) Consistent with that conclusion, the Supreme Court remanded the *812 matter to the Court of Appeal with directions to issue a writ of mandamus vacating the trial court's order dismissing the recommitment petition and to remand the matter to the trial court. (Ibid.) On remand, the trial court was to review the designated evaluators' reports for material legal error and, if necessary, direct the evaluators to prepare new or corrected reports under the correct standard. (Id. at pp. 895, 929.) If the legally erroneous reports deprived the trial court of fundamental jurisdiction, then the trial court would have no power to order corrected or new ones.
In People v. Allen, supra, 42 Cal.4th at pages 94-95, the Supreme Court interpreted the Mentally Disordered Offenders Act, Penal Code section 2960 et seq., to conclude the district attorney's late-filed petition for recommitment prohibited the trial court from extending the defendant's commitment period. Similarly, under the SVPA, the Court of Appeal has held the failure to file a petition for recommitment before the prior commitment period expires divests the trial court of jurisdiction. (See Litmon v. Superior Court, supra, 123 Cal.App.4th at p. 1171.) But "[i]n general, the only act that may deprive a court of jurisdiction is the People's failure to file a petition for recommitment before the expiration of the prior commitment." (People v. Whaley (2008) 160 Cal.App.4th 779, 804 [73 Cal.Rptr.3d 133], italics added.) There is no question the SVPA commitment petition in this case was timely.

E. Prejudice/Fair Trial

Any error in using evaluations based on the invalid assessment protocol did not deprive the trial court of fundamental jurisdiction over the petition to commit Glenn as an SVP. Thus, under the Pompa-Ortiz rule, the error was not reversible per se and Glenn must show he was deprived of a fair trial or suffered prejudice as a result of the assessment protocol to obtain relief.
Instructive on the issue of prejudice are cases concerning irregularities in the SVPA probable cause hearing because such irregularities are subject to harmless error review.[10] (People v. Butler (1998) 68 Cal.App.4th 421, 435 [80 *813 Cal.Rptr.2d 357] (Butler).) In Butler, the defendant challenged his SVP commitment on the ground the trial court did no more than conduct a facial review of the commitment petition at the probable cause hearing. (Butler, supra, 68 Cal.App.4th at p. 435.) The Court of Appeal agreed the trial court erred by not holding a full evidentiary hearing, but held the Pompa-Ortiz rule applied. (Ibid.) The court concluded the defendant suffered no prejudice because "[h]e was found to be an SVP after a trial at which he was able to cross-examine the prosecution's witnesses and call his own witnesses." (Ibid.)
In Hayes, supra, 137 Cal.App.4th 34, 44, the People filed a petition to recommit the defendant just as the initial term of commitment was about to expire. Due to numerous delays, the trial on the recommitment petition had not proceeded to trial by the eve of the two-year recommitment period. (Ibid.) As a result, the People filed a second petition to recommit the defendant for another two-year period. (Ibid.) The trial court consolidated and tried the two recommitment petitions. (Ibid.) The probable cause hearing on the second recommitment petition was not conducted until the conclusion of trial. (Ibid.)
The Court of Appeal concluded the trial court erred by conducting the probable cause hearing on the second recommitment petition at the conclusion of trial, but held the error was not prejudicial under the Pompa-Ortiz rule. (Hayes, supra, 137 Cal.App.4th at p. 49.) Likening the probable cause hearing under the SVPA to a preliminary hearing in a criminal trial, the court reasoned: "Defendant did not have a probable cause hearing until after the evidentiary phase of trial had concluded and jury deliberations had begun. Thus, he had no pretrial probable cause hearing at all. But like the defendant who has an improper, nonevidentiary hearingโor a criminal defendant who has a preliminary hearing without counsel, in effect no hearing at allโ defendant received a full-blown trial and had a jury conclude, beyond a reasonable doubt, that he was an SVP within the meaning of section 6600, subdivision (a)(1)." (Hayes, supra, 137 Cal.App.4th at p. 51.)
In Wright, supra, 128 Cal.App.4th at page 673, the court concluded the defendant received a fair trial because he was represented by counsel, presented his own expert witness, and was permitted to cross-examine the People's witnesses. As for prejudice, the Wright court stated: "The only possible prejudice [the defendant] could have suffered was in the fact that the petition actually proceeded to trial; however, our high court concluded that the erroneous denial of a motion to dismiss an information under Penal Code section 995 will not be reversed on appeal in the absence of a showing that the defendant was deprived of a fair trial, or otherwise prejudiced in the ability to mount a defense." (Ibid.) The fact the defendant was "compelled to `participate in an otherwise fair trial'" therefore did not establish prejudice. (Id. at p. 674.)
*814 Glenn received a fair trial. He was represented by counsel, presented his own witnesses (including two expert witnesses), and cross-examined the People's witnesses. (Butler, supra, 68 Cal.App.4th at p. 435.) After a full, public trial, a jury found he was an SVP. We have concluded Glenn's only assertion of error occurring during trialโthe limitations on his expert witness's testimonyโhad no merit.
Nor did Glenn suffer prejudice. The 2008 OAL Determination No. 19 did not suggest the assessment protocol was flawed or unreliable as an instrument for assessing whether a person might be an SVP. The 2008 OAL Determination No. 19 concerned only the issue whether the assessment protocol was a regulation and expressly stated it was not evaluating its "advisability or . . . wisdom." (2008 OAL Determination No. 19, supra, p. 1.) Once the petition was filed, the People could not rely on the evaluations but were "`required to show the more essential fact'" that Glenn is an SVP. (People v. Scott, supra, 100 Cal.App.4th at p. 1063.) At the probable cause hearing, Glenn could have challenged the evaluations and cross-examined the evaluators. (Hayes, supra, 137 Cal.App.4th at p. 43.) He does not contend the invalid assessment protocol was used at the commitment trial, harmed his ability to mount a defense, or in any way influenced the jury in finding him to be an SVP. He does not challenge the sufficiency of the evidence at either the probable cause hearing or the commitment trial.
Glenn argues, "it is very possible that the [DMH], assuming it follows a fair regulation adoption process, would adopt regulations that create a completely different protocol for the evaluation of sexually violent predators." This type of prejudice is not relevant under a Pompa-Ortiz analysis, and Glenn concedes, "it is completely impossible to predict whether [Glenn] will be found to qualify as a sexually violent predator under the new protocol."
(8) Glenn's challenge to the evaluations based on the invalid assessment protocol fails because he received a fair trial and suffered no prejudice under the Pompa-Ortiz rule. For the same reason, his claim his trial counsel was ineffective for not challenging the evaluations in the trial court also fails. (Strickland v. Washington (1984) 466 U.S. 668, 687-698 [80 L.Ed.2d 674, 104 S.Ct. 2052].) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (Id. at p. 697; accord, In re Fields (1990) 51 Cal.3d 1063, 1079 [275 Cal.Rptr. 384, 800 P.2d 862].)

*815 III.

The 2006 Amendments to the SVPA Do Not Violate Due Process, Equal Protection, Ex Post Facto, and Double Jeopardy.
Glenn argues the SVPA, as amended in 2006, violates the due process, equal protection, ex post facto, and double jeopardy clauses of the United States and California Constitutions. We conclude the 2006 amendments are constitutional.

A. The 2006 Amendments

(9) As originally enacted, the SVPA provided for a two-year term of confinement for persons civilly committed as SVP's, subject to subsequent petitions for extended commitment. (Former ง 6604.) The Legislature amended the SVPA, effective September 20, 2006, to provide for indeterminate commitment terms for persons determined to be SVP's. (Stats. 2006, ch. 337, งง 55, 56, 62.) In the November 2006 general election, California voters approved Proposition 83 (also known as Jessica's Law), which also provided for indeterminate terms of commitment for SVP's. Proposition 83 went into effect on November 8, 2006. (Prop. 83, งง 27, 28; see Cal. Const., art. II, ง 10, subd. (a).)[11] Section 6604 now states: "If the court or jury determines that the person is a sexually violent predator, the person shall be committed for an indeterminate term to the custody of the [DMH] for appropriate treatment and confinement in a secure facility. . . ."
The 2006 Amendments left unchanged the requirement of section 6605 that the committed person "have a current examination of his or her mental condition made at least once every year." (ง 6605, subd. (a).) Proposition 83 did amend section 6605 to change the scope and purpose of the annual examination. Subdivision (a) of section 6605 now includes the following requirements: "The annual report shall include consideration of whether the committed person currently meets the definition of a sexually violent predator and whether conditional release to a less restrictive alternative or an unconditional release is in the best interest of the person and conditions can be imposed that would adequately protect the community. The Department of Mental Health shall file this periodic report with the court that committed the person under this article. The report shall be in the form of a declaration and shall be prepared by a professionally qualified person. A copy of the report *816 shall be served on the prosecuting agency involved in the initial commitment and upon the committed person." As before, the committed person may retain, or if indigent, the court may appoint, "a qualified expert or professional person to examine him or her, and the expert or professional person shall have access to all records concerning the person." (ง 6605, subd. (a).)
The 2006 Amendments amended subdivision (b) of section 6605 to permit the DMH to authorize the committed person to seek conditional release or unconditional discharge. Section 6605, subdivision (b) now provides: "If the Department of Mental Health determines that either: (1) the person's condition has so changed that the person no longer meets the definition of a sexually violent predator, or (2) conditional release to a less restrictive alternative is in the best interest of the person and conditions can be imposed that adequately protect the community, the director shall authorize the person to petition the court for conditional release to a less restrictive alternative or for an unconditional discharge. The petition shall be filed with the court and served upon the prosecuting agency responsible for the initial commitment. The court, upon receipt of the petition for conditional release to a less restrictive alternative or unconditional discharge, shall order a show cause hearing at which the court can consider the petition and any accompanying documentation provided by the medical director, the prosecuting attorney or the committed person."
(10) The 2006 Amendments did not change the procedures and standards used for consideration of a DMH-authorized petition for release. If the trial court determines at a show cause hearing on that petition for release that there is probable cause to believe the person's diagnosed mental disorder has so changed that he or she is not a danger to the health and safety of others and is not likely to engage in sexually violent criminal behavior if discharged, then the court must set a trial on the petition for discharge. (ง 6605, subd. (c).) The committed person is entitled to demand a jury trial, be present at trial, be represented by counsel, and be evaluated by experts. (ง 6605, subd. (d).) The court must appoint counsel and experts for a committed person who is indigent. (Ibid.)
At the hearing on the petition for conditional release or unconditional discharge, "[t]he burden of proof . . . shall be on the state to prove beyond a reasonable doubt that the committed person's diagnosed mental disorder remains such that he or she is a danger to the health and safety of others and is likely to engage in sexually violent criminal behavior if discharged." (ง 6605, subd. (d).) If the court or jury finds in the committed person's favor, *817 the person shall be unconditionally released and discharged. (ง 6605, subd. (e).)
(11) Before the 2006 Amendments, a committed person could file a petition for conditional release or unconditional discharge if the DMH declined to authorize a petition pursuant to section 6605. (ง 6608, former subd. (a).) The 2006 Amendments did not materially change the procedures followed when the DMH declines to authorize the committed person to file a petition for release. Under both former and current section 6608, subdivision (a), a committed person filing a petition for release or discharge without DMH authorization is entitled to assistance of counsel. Under both former and current section 6608, subdivision (a), when a committed person files a petition for release or discharge without DMH authorization, the trial court "shall endeavor whenever possible to review the petition and determine if it is based upon frivolous grounds and, if so, shall deny the petition without a hearing."
Pursuant to section 6608, subdivision (d), the trial court must hold a hearing to determine whether the committed person is likely to engage in sexually violent criminal behavior due to his or her diagnosed mental disorder if under supervision and treatment in the community. If the committed person prevails on the petition, he or she must spend one year in a conditional release program before the court must order a hearing on the person's readiness for unconditional release. (ง 6608, subd. (d); People v. Cheek (2001) 25 Cal.4th 894, 902 [108 Cal.Rptr.2d 181, 24 P.3d 1204] ["Section 6608, which provides for conditional release to a community treatment program, does not mention section 6605, and permits a defendant to be unconditionally released only after the defendant has spent a year in a conditional release program."].) The trial court retains jurisdiction of the person throughout the course of the program. (ง 6608, subd. (d).) At the end of one year, the court holds another hearing to determine "if the person should be unconditionally released from commitment on the basis that, by reason of a diagnosed mental disorder, he or she is not a danger to the health and safety of others in that it is not likely that he or she will engage in sexually violent criminal behavior." (Ibid.)
Section 6608, subdivision (i) was not amended by Proposition 83 and continues to provide that in a hearing on a committed person's section 6608 petition for release or discharge, "the petitioner shall have the burden of proof by a preponderance of the evidence." (ง 6608, subd. (i).) After the trial court *818 denies a section 6608 petition, "the person may not file a new application until one year has elapsed from the date of the denial." (ง 6608, subd. (h).)

B. Due Process

Glenn argues the SVPA and the 2006 Amendments violate the due process clauses of the United States and California Constitutions by imposing an indefinite term of commitment without any requirement that the People prove the SVP remains mentally ill and dangerous.

1. Mathews v. Eldridge Factors

(12) In Mathews v. Eldridge (1976) 424 U.S. 319, 333, 335 [47 L.Ed.2d 18, 96 S.Ct. 893], the Supreme Court identified three factors used to determine whether a person has received due process under the United States Constitution: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of that interest through the procedures used; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional procedure would entail.
(13) The first and third factors are not in dispute here. As to the first factor, "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection. [Citations.]" (Addington v. Texas (1979) 441 U.S. 418, 425 [60 L.Ed.2d 323, 99 S.Ct. 1804] (Addington).) As to the third factor, there is no question the government has a substantial interest in providing treatment to those persons suffering from mental disorders and to protect the public from those whose mental disorders make them a danger to others. (Id. at p. 426.) The government also has a substantial interest in preserving its resources by avoiding the cost of unnecessary litigation. (See U.S. v. Wattleton (11th Cir. 2002) 296 F.3d 1184, 1200-1201.)

2. United States Supreme Court Authority

Glenn's due process challenge is directed to the second factor. He argues that under the 2006 Amendments, once a person is committed as an SVP for an indefinite term, the two procedures available for obtaining release do not provide adequate protection against the risk of an erroneous deprivation. The first procedure to obtain release depends on the DMH authorizing the committed person to file a petition for release or discharge based on the annual review. If the DMH authorizes a petition, and the trial court finds *819 probable cause, then the People must prove beyond a reasonable doubt the committed person remains an SVP. In the second procedure to obtain release, the committed person brings a petition for release. If the trial court finds the petition is not frivolous, then the committed person has the burden of proving by a preponderance of the evidence he or she should be released or discharged.
Glenn's due process argument is based on a quartet of United States Supreme Court cases dealing with constitutional challenges to civil involuntary commitment: Addington, supra, 441 U.S. 418; Jones v. United States (1983) 463 U.S. 354 [77 L.Ed.2d 694, 103 S.Ct. 3043] (Jones); Foucha v. Louisiana (1992) 504 U.S. 71 [118 L.Ed.2d 437, 112 S.Ct. 1780] (Foucha); and Kansas v. Hendricks (1997) 521 U.S. 346 [138 L.Ed.2d 501, 117 S.Ct. 2072] (Hendricks).
The issue in Addington, supra, 441 U.S. at pages 419-422 was whether the Texas civil involuntary commitment statute violated due process by allowing an indefinite initial commitment with proof by a preponderance of the evidence. The Supreme Court held, "the individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence." (Id. at p. 427.) Due process requires proof at least by clear and convincing evidence at the initial civil commitment proceeding. (Id. at p. 433.)
The 2006 Amendments did not alter the requirement of proof beyond a reasonable doubt at the initial SVPA commitment trial. Addington did not address procedures and burdens of proof following the initial commitment.
Jones, supra, 463 U.S. 354 concerned the District of Columbia's statutory scheme for confinement of persons found not guilty by reason of insanity (NGI). The District of Columbia statute required a criminal defendant to prove an NGI defense by a preponderance of the evidence. (Id. at p. 356, fn. 1.) After acquittal by reason of insanity, the statute required the defendant's immediate and indefinite confinement to a mental hospital without a hearing. (Id. at p. 356, fn. 2.) The statute required a hearing within 50 days of commitment to determine whether the defendant was eligible for release. (Id. at pp. 356-357.) At the hearing, the defendant had the burden of proof by a preponderance of the evidence. (Id. at p. 357.) If he or she did not meet that burden at the 50-day hearing, he or she was entitled by statute to a hearing every six months at which he or she had the burden by a preponderance of the evidence to prove entitlement to release. (Id. at pp. 357-358, 359.)
*820 The Supreme Court first addressed the defendant's argument that the finding of NGI at the criminal trial was sufficient to justify commitment. (Jones, supra, 463 U.S. at p. 363.) The court concluded a verdict of NGI establishes the defendant committed an act constituting a criminal offense and the defendant committed the act because of mental illnessโfacts sufficient to support involuntary commitment for an indefinite period. (Id. at pp. 363-364.)
The Supreme Court next addressed the defendant's argument his indefinite commitment was unconstitutional because proof of insanity was based only on a preponderance of the evidence, contrary to Addington's requirement of proof by clear and convincing evidence. (Jones, supra, 463 U.S. at pp. 366-367.) In rejecting that argument, the court focused on risk of erroneous commitment: "The Addington Court expressed particular concern that members of the public could be confined on the basis of `some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable.' [Citations.] In view of this concern, the Court deemed it inappropriate to ask the individual `to share equally with society the risk of error.' [Citation.] But since automatic commitment under [the District of Columbia statute] follows only if the acquittee himself advances insanity as a defense and proves that his criminal act was a product of his mental illness, there is good reason for diminished concern as to the risk of error. More important, the proof that he committed a criminal act as a result of mental illness eliminates the risk that he is being committed for mere `idiosyncratic behavior,' [citation]." (Id. at p. 367, fns. omitted.)
Finally, the Supreme Court addressed whether the defendant was entitled to release from confinement because he had been hospitalized for a longer period of time than he would have spent incarcerated if he had been convicted. (Jones, supra, 463 U.S. at p. 368.) On this point, the court held, "when a criminal defendant establishes by a preponderance of the evidence that he is not guilty of a crime by reason of insanity, the Constitution permits the Government, on the basis of the insanity judgment, to confine him to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society." (Id. at p. 370.)
Under Jones, it is permissible in certain circumstances to shift the burden to the committed person to prove by a preponderance of the evidence he or she no longer should be subject to civil commitment. Glenn argues Jones permits this burden-shifting only when, as in the case of an NGI plea, the committed person first raised the issue of mental illness. The focus of Jones is not on who raises the issue of mental illness, but whether the statutory scheme includes sufficient safeguards against erroneous deprivation. Thus, the *821 court in Jones reasoned the concerns expressed in Addington of wrongful confinement for abnormal behavior will be satisfied whenever there are sufficient safeguards to prevent the defendant from being committed for engaging in merely idiosyncratic behavior.
(14) The SVPA and the 2006 Amendments include safeguards against erroneous deprivations at least as effective as those approved in Jones. Under the SVPA, a person charged as an SVP is entitled to appointment of medical professionals and counsel, and to a jury trial. At the commitment trial, the People have the burden of proof beyond a reasonable doubt that the committed person is an SVP. In contrast, under the District of Columbia statute at issue in Jones, a defendant asserting NGI need only prove mental illness by a preponderance of the evidence. Under the 2006 Amendments, the burden shifts to the committed person to prove he or she should be released or discharged only if the DMH does not authorize a petition for discharge or release following an annual review and evaluation by a medical professional. For the annual review, the committed person is entitled to appointment of a medical professional. These safeguards diminish the risk of error in determining the committed person is an SVP and justify shifting the burden to the committed person to prove by a preponderance of the evidence he or she should be released or discharged from commitment.
Foucha, supra, 504 U.S. 71 dealt with a person committed for an indefinite period after being found NGI under Louisiana law. The opening paragraph of the opinion explains the background and context: "When a defendant in a criminal case pending in Louisiana is found not guilty by reason of insanity, he is committed to a psychiatric hospital unless he proves that he is not dangerous. This is so whether or not he is then insane. After commitment, if the acquittee or the superintendent begins release proceedings, a review panel at the hospital makes a written report on the patient's mental condition and whether he can be released without danger to himself or others. If release is recommended, the court must hold a hearing to determine dangerousness; the acquittee has the burden of proving that he is not dangerous. If found to be dangerous, the acquittee may be returned to the mental institution whether or not he is then mentally ill. Petitioner contends that this scheme denies him due process and equal protection because it allows a person acquitted by reason of insanity to be committed to a mental institution until he is able to demonstrate that he is not dangerous to himself and others, even though he does not suffer from any mental illness." (Id. at p. 73.)
In Foucha, the trial court declined to release the petitioner after a hearing in which no medical professional testified he suffered from a mental illness, and the only positive evidence of dangerousness was the testimony by medical professionals who did not feel comfortable in certifying the petitioner would not be dangerous if released. (Foucha, supra, 504 U.S. at pp. 74-75.)
*822 The Supreme Court held, first, the petitioner could not continue to be confined in a mental institution because "according to the testimony given at the hearing in the trial court, [the petitioner] is not suffering from a mental disease or illness." (Foucha, supra, 504 U.S. at p. 79.) The Supreme Court held next, "if [the petitioner] can no longer be held as an insanity acquittee in a mental hospital, he is entitled to constitutionally adequate procedures to establish the grounds for his confinement." (Ibid.) What procedures are constitutionally adequate? At the petitioner's recommitment hearing in Foucha, no medical professionalโor anybody else for that matterโtestified the petitioner would be a danger to the community. (Id. at p. 82.) The only evidence at the hearing supporting recommittal was a description of the petitioner's antisocial behavior while in prison and testimony by physicians that they would not "`feel comfortable'" in certifying that the petitioner would not be dangerous to himself or other people. (Ibid.) The Supreme Court concluded such evidence was "not enough to defeat [the petitioner]'s liberty interest under the Constitution in being freed from indefinite confinement in a mental facility." (Ibid.)
Near the end of the majority opinion, the court stated: "Furthermore, in civil commitment proceedings the State must establish the grounds of insanity and dangerousness permitting confinement by clear and convincing evidence. [Citation.] Similarly, the State must establish insanity and dangerousness by clear and convincing evidence in order to confine an insane convict beyond his criminal sentence, when the basis for his original confinement no longer exists. [Citations.]" (Foucha, supra, 504 U.S. at p. 86.)
Glenn quotes that passage from Foucha as supporting his argument the 2006 Amendments violate due process by shifting the burden to the SVP seeking release or discharge from confinement. We disagree with Glenn's interpretation. Immediately after the above quoted passage, the Supreme Court stated: "However, the State now claims that it may continue to confine [the petitioner], who is not now considered to be mentally ill, solely because he is deemed dangerous, but without assuming the burden of proving even this ground for confinement by clear and convincing evidence. The court below gave no convincing reason why the procedural safeguards against unwarranted confinement which are guaranteed to insane persons and those who have been convicted may be denied to a sane acquittee, and the State has done no better in this Court." (Foucha, supra, 504 U.S. at p. 86.)
In light of this language, and the facts of the case, we interpret Foucha to mean the state must prove a person found NGI both is dangerous and has a mental disorder to justify confinement, and that mere antisocial behavior and the discomfort of a medical professional are not enough to establish dangerousness. The Louisiana statute violated due process rights by permitting the *823 trial court to order the petitioner's continued confinement despite undisputed evidence he was not mentally ill.
(15) Here, in contrast, the SVPA does not allow a court to order continued confinement when the DMH and the medical professionals who evaluated the committed person all agree the person no longer has a diagnosed mental disorder or no longer poses a danger to the health and safety of others, unless the state proves the contrary by evidence beyond a reasonable doubt. The 2006 Amendments include procedures and safeguards, including an annual review, to determine whether the committed person should remain in confinement.
Finally, in Hendricks, the Supreme Court held only (1) the Kansas SVP statute's definition of "mental abnormality" satisfied due process; and (2) the statute did not violate the United States Constitution's ex post facto and double jeopardy prohibitions. (Hendricks, supra, 521 U.S. at pp. 357, 360-361, 371.) The court did not address the constitutionality of the statute's indeterminate period of commitment or of the procedure by which the committed person may obtain release.
(16) In sum, Addington, Jones, Foucha, and Hendricks, neither individually nor collectively, support the argument the 2006 Amendments violate due process. As we have explained, the SVPA and the 2006 Amendments include procedures containing sufficient safeguards against the risk of an erroneous deprivation to satisfy the Mathews v. Eldridge test, and therefore do not violate due process.

C. Equal Protection

Glenn argues the 2006 Amendments violate the equal protection clauses of the United States Constitution and the California Constitution by treating SVP's differently and more harshly than similarly situated committed persons, including those committed under the Mentally Disordered Offenders Act, Penal Code section 2960 et seq., and the Lanterman-Petris-Short Act, Welfare and Institutions Code section 5300 et seq. (LPSA), and those committed as NGI under Penal Code section 1026 et seq. As SVP's are not similarly situated to such other persons subject to civil commitment, Glenn's equal protection challenge fails.
(17) The equal protection clauses of the United States Constitution and the California Constitution require that persons similarly situated with respect to a law's legitimate purpose receive like treatment. (People v. Guzman (2005) 35 Cal.4th 577, 591 [25 Cal.Rptr.3d 761, 107 P.3d 860]; Cooley, supra, 29 Cal.4th at p. 253.) The first issue in addressing an equal protection claim is *824 whether the state has adopted a classification that affects two or more similarly situated persons or groups in an unequal manner. (Cooley, supra, 29 Cal.4th at p. 253.) "This initial inquiry is not whether persons are similarly situated for all purposes, but `whether they are similarly situated for purposes of the law challenged.'" (Ibid.) "If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold." (People v. Buffington (1999) 74 Cal.App.4th 1149, 1155 [88 Cal.Rptr.2d 696].)
(18) If the state's classification affects two or more similarly situated persons unequally for purposes of the law challenged, then the classification is subject to judicial scrutiny. (People v. Buffington, supra, 74 Cal.App.4th at p. 1155.) Strict scrutiny is the standard for measuring claims of unequal treatment in cases of involuntary civil commitment. (People v. Green (2000) 79 Cal.App.4th 921, 924 [94 Cal.Rptr.2d 355].)
(19) SVP's differ fundamentally from all other persons subject to civil commitment because, by definition, SVP's represent a small number of dangerous persons who have committed specified sex crimes and suffer from any of a number of mental disorders predisposing SVP's to commission of sexually violent acts in the future. (Cooley, supra, 29 Cal.4th at p. 253.) An SVP, because of his or her mental illness, "presents a substantial danger, that is, a serious and well-founded risk, that he or she will commit such crimes if free in the community." (Ghilotti, supra, 27 Cal.4th at p. 922.) SVP's have very high recidivism rates; they are "`the least likely to be cured and the most likely to reoffend.'" (Historical and Statutory Notes, 47C West's Ann. Pen. Code (2008 ed.) foll. ง 209, p. 52; Voter Information Guide, Gen. Elec. (Nov. 7, 2006) text of Prop. 83, ง 2, subd. (b), p. 127.) This heightened level of dangerousness and resistance to treatment distinguish SVP's from others subject to involuntary civil commitment.
Persons committed as SVP's are not similarly situated to persons committed as mentally disordered offenders. The Mentally Disordered Offenders Act targets persons with severe mental disorders that might be kept in remission with treatment, while the 2006 Amendments recognize that persons committed as SVP's have mental disorders that might never be successfully treated. (See People v. Hubbart (2001) 88 Cal.App.4th 1202, 1222 [106 Cal.Rptr.2d 490]; People v. Buffington, supra, 74 Cal.App.4th at p. 1163; compare Pen. Code, ง 2962, subd. (a) with Welf. & Inst. Code, ง 6606, subd. (b).) When enacting the 2006 Amendments, the voters acknowledged that SVP's differ from other civilly committed persons because of the likelihood they will reoffend and the likelihood they will not be cured. The voter information *825 guide for Proposition 83 stated SVP's have very high rates of recidivismโ much higher than rates for other violent felonsโand "are the least likely to be cured." (Voter Information Guide, Gen. Elec., supra, text of Prop. 83, ง 2, subd. (b), p. 127.)
The Wisconsin Supreme Court, in rejecting a similar equal protection challenge, stated: "The legislature has determined that as a class, persons predisposed to sexual violence are more likely to pose a higher level of danger to the community than do other classes of mentally ill or mentally disabled persons. This heightened level of dangerousness and the unique treatment needs of sexually violent persons justify distinct legislative approaches to further the compelling governmental purpose of protection of the public." (State v. Post (1995) 197 Wis.2d 279, 322-323 [541 N.W.2d 115], cert. den. sub nom. Post et al. v. Wisconsin (1997) 521 U.S. 1118 [138 L.Ed.2d 1011, 117 S.Ct. 2507].)
Persons committed as SVP's are not similarly situated to those committed under the LPSA, which provides for evaluation and treatment of mentally ill members of the public in a wide range of circumstances and applies to persons who have not committed any crime. (ง 5300.5, subd. (b).) In contrast, the SVPA targets a narrow class of SVP's who have committed a felony, are incarcerated in state prison at the time they become the subject of a commitment petition, and have a mental disorder predisposing them to committing criminal sexual acts to a degree making them a menace to public health and safety. (Cooley, supra, 29 Cal.4th at p. 253; see ง 6600, subd. (c).)
Persons committed as SVP's are not similarly situated to those committed after being found NGI. Involuntary civil commitment as a result of being found NGI is the direct consequence of a criminal act: The commitment forms an alternative to the prison term that would have been imposed if the defendant had been found to have been sane at the time of the commission of the underlying crime. (Pen. Code, ง 1026.) No specific crime is necessary for the involuntary commitment of persons found NGI, nor is it necessary for persons committed as NGI to have a mental illness that predisposes them to commit particular crimes in the future. In contrast, an SVP is a person who has committed specific types of crimes and has a diagnosed mental disorder predisposing the person to commission of violent sexual acts in the future. (ง 6600, subds. (a)(1), (c).)

D. Ex Post Facto/Double Jeopardy

Glenn argues the 2006 Amendments are punitive rather than civil and therefore violate the ex post facto and double jeopardy prohibitions of the federal and state Constitutions.
*826 (20) Both the federal Constitution and the state Constitution prohibit ex post facto laws (U.S. Const., art. I, ง 10, cl. 1; Cal. Const., art. I, ง 9) and prohibit placing a person in double jeopardy for the same offense (U.S. Const., 5th Amend.; Cal. Const., art. I, ง 15). The ex post facto clauses prohibit only those laws retroactively altering the definition of crimes or increasing the punishment for criminal acts. (Collins v. Youngblood (1990) 497 U.S. 37, 43 [111 L.Ed.2d 30, 110 S.Ct. 2715].) The federal and state ex post facto clauses are interpreted identically. (People v. Helms (1997) 15 Cal.4th 608, 614 [63 Cal.Rptr.2d 620, 936 P.2d 1230].) Under the double jeopardy provisions, "once a criminal defendant is placed on trial and the jury is duly impaneled and sworn, a discharge of the jury without a verdict is equivalent to an acquittal and bars retrial unless (1) the defendant consents to the discharge or (2) legal necessity requires it." (Larios v. Superior Court (1979) 24 Cal.3d 324, 329 [155 Cal.Rptr. 374, 594 P.2d 491].)
(21) A two-part test is used to determine whether a statutory scheme is punitive for purposes of ex post facto analysis. (Smith v. Doe (2003) 538 U.S. 84, 92 [155 L.Ed.2d 164, 123 S.Ct. 1140]; Hendricks, supra, 521 U.S. at p. 361.) The court first determines whether the Legislature intended to impose punishment: "If the intention of the legislature was to impose punishment, that ends the inquiry." (Smith v. Doe, supra, 538 U.S. at p. 92; Hendricks, supra, 521 U.S. at p. 361.) If the court determines the Legislature intended to enact "a regulatory scheme that is civil and nonpunitive," then the court must determine whether the statutory scheme is "`"so punitive either in purpose or effect as to negate [the State's] intention" to deem it "civil."'" (Smith v. Doe, supra, 538 U.S. at p. 92; Hendricks, supra, 521 U.S. at p. 361.)
The intent of the 2006 Amendments was not to inflict punishment.[12] The official voter information guide stated: "It is the intent of the People of the State of California in enacting this measure to strengthen and improve the laws that punish and control sexual offenders." (Voter Information Guide, Gen. Elec., supra, text of Prop. 83, ง 31, p. 138, italics added.) The voter information guide also stated one purpose of the amendments to the SVPA was to eliminate "unnecessary or frivolous jury trial actions where there is no competent evidence to suggest a change in the committed person." (Voter Information Guide, Gen. Elec., supra, text of Prop. 83, ง 2, subd. (k), p. 127.)
Proposition 83 stated the change to an indeterminate term is designed to eliminate automatic SVP trials every two years when nothing suggests a *827 change in the committed person's SVP condition to warrant release: "`The People find and declare each of the following: [ถ] . . . [ถ] (k) California is the only state, of the number of states that have enacted laws allowing involuntary civil commitments for persons identified as sexually violent predators, which does not provide for indeterminate commitments. California automatically allows for a jury trial every two years irrespective of whether there is any evidence to suggest or prove that the committed person is no longer a sexually violent predator. As such, this act allows California to protect the civil rights of those persons committed as a sexually violent predator while at the same time protect society and the system from unnecessary or frivolous jury trial actions where there is no competent evidence to suggest a change in the committed person.'" (Historical and Statutory Notes, 47C West's Ann. Pen. Code, supra, foll. ง 209, pp. 52, 53; Voter Information Guide, Gen. Elec., supra, text of Prop. 83, ง 2, subd. (k), p. 127; see People v. Shields (2007) 155 Cal.App.4th 559, 564 [65 Cal.Rptr.3d 922].)
In People v. Allen, supra, 44 Cal.4th at pages 861-862, the California Supreme Court explained the intent of Proposition 83's provisions addressing civil commitment was not to punish: "Defendant next contends that Proposition 83, which was approved by the voters in November 2006, establishes that a purpose of proceedings under the SVPA is to punish individuals found to be sexually violent predators. The trial of the allegations under the petition to extend defendant's commitment occurred in 2005, prior to the passage of Proposition 83. Moreover, defendant's reliance upon references in the preamble of Proposition 83 to `adequate penalties' and `laws that punish,' and upon the circumstance that many of the amendments made by Proposition 83 concern the punishment of sex offenders, is misplaced. Proposition 83 amended the Penal Code as well as the Welfare and Institutions Code. The intent to punish sexually violent predators through Penal Code provisions that apply to criminal prosecutions does not establish an intent to punish sexually violent predators through Welfare and Institutions Code provisions that apply to civil commitment proceedings. Although Proposition 83 made amendments to both the criminal and the civil schemes, it recognized the different purposes of these two schemes, stating in the preamble: `Existing laws that punish aggravated sexual assault, habitual sexual offenders, and child molesters must be strengthened and improved. In addition, existing laws that provide for the commitment and control of sexually violent predators must be strengthened and improved.' (Voter Information Guide, Gen. Elec.[, supra,] text of Prop. 83, ง 2, subd. (h), p. 127 . . . .) For the same reason, the argument of the proponents of Proposition 83 that `[o]ur families deserve the protection of a tough sex offender punishment and control law' (Voter *828 Information Guide, Gen. Elec., supra, argument in favor of Prop. 83, p. 46) does not establish that the provisions of Proposition 83 addressing the civil commitment of sexually violent predators were intended to punish defendants."
The 2006 Amendments were not sufficiently punitive in effect to negate the intent to deem the 2006 Amendments civil. The provision for indeterminate periods of commitment does not in itself make the 2006 Amendments punitive in effect. In Hendricks, supra, 521 U.S. at page 363, the Supreme Court rejected the argument the Kansas SVP act was punitive in effect by providing for potentially indefinite confinement. The court stated the critical factor is whether the duration of confinement is "linked to the stated purposes of the commitment, namely, to hold the person until his mental abnormality no longer causes him to be a threat to others." (Hendricks, at p. 363; see also Hubbart v. Superior Court, supra, 19 Cal.4th at pp. 1176-1177.)
The 2006 Amendments provide for an indeterminate period of commitment, but the term's duration is linked to treatment of the committed person until his or her mental disorder no longer causes him or her to be a threat to others. The 2006 Amendments provide procedures for the release of a committed person who no longer is an SVP. (งง 6605, 6608.) The 2006 Amendments left unchanged the requirement of section 6605 that the committed person have an annual mental examination, and expanded the scope and purpose of the examination to include consideration whether the committed person remains an SVP. (ง 6605, subd. (a).) As before, the committed person may retain, or, if indigent, is entitled to appointment of his or her own expert. (Ibid.) As a result of the annual examination, the DMH may authorize the committed person to file a petition for release or discharge. (ง 6605, subd. (b).) Without DMH authorization, the committed person may bring a petition for release or discharge. (ง 6608, subd. (a).)
(22) In sum, the purpose and effect of the 2006 Amendments were not to punish, but to make sure the committed person is confined until the person is no longer a threat to public safety, without having to conduct unnecessary recommitment trials every two years. Annual reviews and procedures for release protect the committed person from being confined "any longer than he suffers from a mental abnormality rendering him unable to control his dangerousness." (Hendricks, supra, 521 U.S. at p. 364.)

*829 DISPOSITION
The judgment is affirmed. The order to show cause is dissolved and the petition for writ of habeas corpus is denied.
Sills, P. J., and Moore, J., concurred.
NOTES
[1] Further code references are to the Welfare and Institutions Code unless otherwise noted.
[2] Schwartz defined pedophilia as having two components. The first is "recurrent intense sexually arousing fantasies or sexual urges or behaviors ... with prepubescent children ... over a period longer than six months." The second is "the person has acted on the urges or the fantasies ... [a]nd/or the fantasies have caused marked distress in his life."
[3] Schwartz defined exhibitionism as the tendency to expose one's genitals to unsuspecting strangers.
[4] Specifically, Abbott was precluded from testifying (1) certain text authors had concluded pedophilia cannot be diagnosed based on the number of prepubescent victims over time; (2) Seto had written a book in which he concluded pedophilia was not necessarily chronic; and (3) as shown in the PowerPoint demonstration, Milloy and other experts in the field had reached the same conclusion. Glenn also argues he should have been able to introduce a graph prepared by Milloy on six-year recidivism rates.
[5] Glenn's evaluations were conducted in 2004 or 2005, and the OAL determined the 2007 assessment protocol was an underground regulation (2008 OAL Determination No. 19 (Aug. 15, 2008) p. 1 [as of Oct. 26, 2009]). Neither party argues the assessment protocol under which Glenn was evaluated differed materially from the 2007 assessment protocol determined by the OAL to constitute an underground regulation. Glenn argues: "Very likely, based upon the timing, [Glenn] was evaluated pursuant to the 2005 version of the handbook and protocol. However, that document was not adopted in accordance with the APA and is equally invalid as the 2007 version."
[6] California Code of Regulations, title 1, section 250, subdivision (a) provides: "`Underground regulation' means any guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule, including a rule governing a state agency procedure, that is a regulation as defined in Section 11342.600 of the Government Code, but has not been adopted as a regulation and filed with the Secretary of State pursuant to the APA and is not subject to an express statutory exemption from adoption pursuant to the APA."
[7] The DMH apparently has not challenged 2008 OAL Determination No. 19, and, in early 2009, promulgated emergency regulations, a copy of which is included as an exhibit in the combined respondent's brief and return.
[8] In Litmon v. Superior Court (2004) 123 Cal.App.4th 1156, 1171 [21 Cal.Rptr.3d 21], the court listed the acts that have been held not to divest the trial court of jurisdiction over an SVPA proceeding: "[I]t has been held that the pendency of an appeal from the prior commitment order does not divest the trial court of jurisdiction over a subsequent recommitment petition (People v. Hedge (1999) 72 Cal.App.4th 1466, 1475-1477 [86 Cal.Rptr.2d 52]); that the unlawfulness of the SVP's underlying custody does not divest the court of jurisdiction to proceed on a recommitment petition (id. at p. 1478); that failure to complete the trial on a subsequent petition before the expiration of the prior commitment period does not divest the trial court of jurisdiction to proceed on the subsequent petition for commitment (People v. Superior Court (Ramirez) (1999) 70 Cal.App.4th 1384, 1390 [83 Cal.Rptr.2d 402]); that the failure to obtain a recommitment order on the second/subsequent petition before the expiration of the underlying second commitment term does not divest the court of jurisdiction (Orozco v. Superior Court (2004) 117 Cal.App.4th 170, 178-179 [11 Cal.Rptr.3d 573]); and that delaying trial on a recommitment petition beyond the two years of the underlying commitment term does not violate the SVP's due process rights where the SVP or the SVP's attorney is responsible for the delays (id. at pp. 179-180)."
[9] The SVPA requires that the "independent professional[s]," appointed under section 6601, subdivision (e), have "at least five years of experience in the diagnosis and treatment of mental disorders" and either be a psychiatrist or a licensed psychologist with a "doctoral degree in psychology." (ง 6601, subd. (g).)
[10] The probable cause hearing required by the SVPA is considered analogous to a preliminary hearing in a criminal case. "Under the SVPA, an individual can only proceed to a trial if `the judge determines there is probable cause,' and the petition is dismissed if `there is not probable cause.' (ง 6602, subd. (a).) The probable cause hearing, therefore, is only a preliminary determination that cannot form the basis of a civil commitment; the ultimate determination of whether an individual can be committed as an SVP is made only at trial. (ง 6604.) For this reason, based on the structure of the SVPA, a section 6602 hearing is analogous to a preliminary hearing in a criminal case; both serve to `"`weed out groundless or unsupported charges . . . and to relieve the accused of the degradation and expense of a . . . trial.'"' [Citation.] Like a criminal preliminary hearing, the only purpose of the probable cause hearing is to test the sufficiency of the evidence supporting the SVPA petition." (Cooley v. Superior Court (2002) 29 Cal.4th 228, 247 [127 Cal.Rptr.2d 177, 57 P.3d 654] (Cooley).)
[11] We refer to the Legislature's 2006 amendments to the SVPA and to Proposition 83 collectively as the 2006 Amendments.
[12] In Hubbart v. Superior Court, supra, 19 Cal.4th at page 1179, the California Supreme Court held the pre-Proposition 83 version of the SVPA did not constitute an ex post facto law because it did not impose liability or punishment for criminal conduct. The court rejected the argument that involuntary commitment under the SVPA was equivalent to a prison sentence. (Hubbart v. Superior Court, supra, 19 Cal.4th at p. 1176.)